[L. A. No. 12787. In Bank.—March 29, 1933.]

WALTER J. BROWNING, Appellant, v. IRIS ASHTON EVANS et al., Respondents.

Lewis Cruickshank and Donald Armstrong for Appellant.

Mitchell, Silberberg & Davis and Peery Price for Respondents.

SEAWELL, J.—Plaintiff seeks to establish a resulting trust in his favor and to quiet title to real property situate in the city of Los Angeles, which was purchased in 1922 at a price of $17,000 with funds furnished entirely by him. Title thereto was taken in the name of Cora Ashton, who in 1924 conveyed to her daughter, Iris Ashton Badger, now Iris Ashton Evans. The trial court found that it was the intention of plaintiff and appellant to make a gift of said real property to defendant and respondent Iris Ashton Evans, and that title was originally taken in the name of her mother, Cora Ashton, to be held by her until it could be transferred to her daughter without danger of clouding the title by reason of the then existing marriage between the daughter and one W. G. Badger. The conveyance to the daughter was executed after she had procured a divorce from Badger. Because of the fact that defendant and respondent Iris Ashton Evans has had three names, her maiden name and two married names, during the period covered by the facts herein related, for convenience we will refer to her by her maiden name, Iris Ashton.

The sole contention of appellant is that the evidence which the trial court relies on to support the finding of gift as a matter of law is too insubstantial to overcome the presumption declared in section 853 of the Civil Code: "When a transfer of real property is made to one person and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made." (For discussion of purchase money resulting trusts, with citation of authorities, see 25 Cal. Jur. 191 et seq.)

Plaintiff Walter J. Browning is a mining engineer by profession, and at the time of the transaction herein related was a middle-aged man. He and Frank Ashton, father of the defendant Iris Ashton, and husband of Cora Ashton, had been associated together in some sort of mining enterprise in Mexico in 1899, where Frank Ashton and his family, including defendant Iris, then two years of age, had resided. A close and intimate friendship, as well as a business relationship, was established between the plaintiff and the Ashton family at that time. For some years preceding the purchase of the property herein involved, plaintiff had spent part of

his time in England and the balance in Spain, where he was one of the managing executives directing a large copper mine, but the contact between the two men seems to have been maintained through their joint ownership of speculative mining properties in Mexico.

Plaintiff did not see defendant Iris Ashton nor her mother from the time Iris was four years old until he visited them in Los Angeles in 1922. However, before that visit they had become friends through a correspondence initiated by Iris Ashton in June, 1919, when she wrote plaintiff a letter of condolence upon the loss of his wife and only child. In his bereavement plaintiff turned to the Ashtons. Several letters written by him to Iris Ashton between July, 1919, and April, 1922, when he came to Los Angeles to visit the Ashtons, and also a letter written by him to Cora Ashton, mother of Iris Ashton, appear in the record. These letters are replete with expressions of affectionate regard for his old friends, the Ashtons, and of his desire to renew and strengthen the friendship by visiting them in Los Angeles. The thought which he reiterates in these letters is that it is the privilege of loving, caring for and working for others which makes life worth while. His family gone, the future seemed empty. In his first letter to Iris Ashton, written on July 25, 1919, he said: "A future which is blank and robbed of all possibilities and so different from one in which there are endless chances to do things, to accomplish something, to care and to feel that one is cared for and loved. When all this goes child, what remains except memories?"

It is very plain from the tenor of these letters that although memories of the old friendship with Mr. and Mrs. Ashton remained vivid, his interest in their daughter had come to be the predominating motive in his relations with the family even before his visit to Los Angeles. The daughter was then about twenty-five years of age and seems to have possessed considerable beauty and charm. She had ambitions to become a motion picture actress. She was not meeting with much success in this endeavor, but had some employment as a fashion model. She had separated from her first husband, W. G. Badger. She and her mother were living in a single rented room in a condemned house in Los Angeles. Plaintiff was much impressed with her account of her difficulties. She sent him her photograph and snapshots

of herself and seems to have made a confidant of him. On October 19, 1918, three months after the commencement of the correspondence, he wrote to her: "I can see by your photograph that you have beauty and your mirror tells you this, but I can also see that you have the sweet artistic temperament of your Southern mother combined with the romantic and semi-poetic nature of your father, and I am so longing to know you again—for a girl, for that is all you are in years, you have had a hard trail to follow at times, but fortunately you have had a devoted, sacrificing Mother and a loving fighting Father to help you, and now Iris you have another big friend too. Yours and your father's old friend, who now comes into your life."

On August 20, 1920, plaintiff wrote: "I am sure that somehow or other if I went to Los Angeles I could keep [help?] you along in your work. I do not know how, but I feel that it is so, hence my wish to go there . . . Write to me, tell me your hopes, dreams, and wishes. Remember that I am always your friend."

In April, 1922, the projected visit became a reality. Plaintiff in his testimony would make it appear that he went to Mexico from Spain to see Frank Ashton, father of Iris Ashton, on business, and went from there to Los Angeles solely at the request of Frank Ashton to see what he could do to relieve the necessitous condition of the family, and that his principal concern was for the wife and mother, Cora Ashton. In the light of the letters written by plaintiff to Iris Ashton his explanation probably did not carry convincing weight with the trial court. A letter written by plaintiff to Iris Ashton on January 7, 1922, makes it plain that the Los Angeles visit had been definitely planned for some time.

While in Los Angeles plaintiff stayed at a hotel across the street from where the Ashtons roomed. A round of good times followed. He was with them almost constantly during his stay from April 20th to May 7th, except for a few days when he made a business trip to Oregon. In retrospect, plaintiff wrote to Iris Ashton of his visit to an oasis in the desert of his life, a glorious happy few days, when he glimpsed a blue sky through sullen heavy clouds with a little sunshine coming through to wake him from his dreams. He and Iris Ashton were fond of dancing, and went to cafes and

hotels, took trips to the beaches, and otherwise devoted themselves to entertaining each other. The mother and brother were included in some of the outings, but it was to the daughter that plaintiff devoted himself most attentively. This is apparent from the letters written by him after his visit, as well as from the oral testimony upon the trial.

When plaintiff left Los Angeles for the east coast to embark for Europe, Iris Ashton accompanied him on the train as far as San Antonio, Texas, where she was to visit relatives. He paid her fare on this trip. Before leaving Los Angeles he had purchased a coupe automobile as a gift for her, to be delivered on her return from San Antonio. He also gave her an emerald ring. According to Iris Ashton, plaintiff made his first definite offer to provide a home for her and her family upon this trip, when he asked her what she wanted more than anything else in the world, and she replied that she desired a home of her own. Plaintiff claimed in his testimony that a large part of the time on his visit was given over to looking for a house which he should rent or buy to provide the Ashton family with a more suitable home. The letters which passed between plaintiff and Iris Ashton strongly tend to confirm her testimony in every particular. But whether the first definite offer was made upon this trip or had been made prior thereto, it had been definitely arranged before Iris left the train at San Antonio that upon her return to Los Angeles she should select a suitable home, and that plaintiff should provide funds with which to purchase it.

On May 31, 1922, Iris Ashton cabled plaintiff in Spain: "Found ideal seventeen thousand advise Iris." On June 3d, he replied: "Telegram received. Have mailed drafts for $12,000 and could if you wish send another five at end of July." He sent drafts for $12,000 to a Los Angeles bank for the account of Iris Ashton, and later sent drafts for $5,000. The purchase was completed on July 31, 1922. Title was taken in the name of Cora Ashton, and in 1924 she conveyed to her daughter, Iris.

Plaintiff filed the complaint to establish a resulting trust in his favor on August 23, 1929. He alleged that it was agreed between him and Iris and Cora Ashton that title to the property should be held in trust for him in the name of Cora Ashton, and that Iris Ashton, on August 27, 1924, with

full knowledge of this agreement, wrongfully and without right caused Cora and Frank Ashton to convey it to her; that he did not learn of this transfer until early in 1928, and that he had demanded of Iris Ashton that she transfer said property to him, but that she had refused. In December, 1924, plaintiff had married a second time in England, but Iris Ashton did not learn of his marriage, according to her testimony, until some time in 1927, notwithstanding the correspondence continued.

The letters written by plaintiff to Iris Ashton conclusively demonstrate the falsity of the charge that the transfer of record title was made without his knowledge and consent, and show that the record title was at all times vested exactly as he had authorized and directed. They did not believe it advisable to take title originally in the name of Iris Ashton because she had not then procured a divorce from W. G. Badger. On May 28th, before receipt of the wire advising him that a house had been found, plaintiff wrote: "If there should be any difficulty in the annulment or divorce proceedings, you might ask Mr. Ellis (without saying that it is a purchase contemplated) whether a little piece of property would be all right to stand in your name as Iris Ashton, or whether it had best be in your mother's or mine as your guardian." On June 25, 1922, he wrote: "To put it in your mother's name dear is quite the best thing, until you are able to resume your own name and then she can transfer it to you or do whatever you think best." In accordance with this intention, the transfer of August, 1924, to Iris Ashton was made, and on being informed of it, plaintiff wrote, on October 8, 1924, "The dream-house must look pretty and now it stands recorded in your name and it has been the means of your keeping the family together, bringing smiles to C. B.'s [Cora Ashton] lips, a lot of pleasure and happiness to you both and so it has fulfilled its mission. The only condition I made was that the house must never under any circumstances be placed in danger. It must never be given as security no matter how safe the investment looks it must always remain free-free-free.

"Standing as it does in your name alone, no one can pledge it without your consent, and that I know will never be given."

Plaintiff's claim that the record title was not to be transferred to Iris Ashton is shown by his letters to be unfounded. That plaintiff intended the record title to be vested in Iris Ashton, and that he provided the funds for the purchase of the property for the avowed purpose of providing the Ashtons with a home is indisputable. The only question as to which there can be any possible doubt is whether he intended to make a gift of the fee title to the property to Iris Ashton, or merely to give the Ashtons the use of the property as a home, retaining ownership of the fee himself. Plaintiff offers no explanation as to why, if he intended to give them only the use of the house, he directed legal title to be vested in Cora Ashton, rather than in himself, nor why, if they were to have only the use, it should be his intention that the legal title be transferred from Cora Ashton, in whom he is shown to have reposed full confidence, to Iris Ashton. ▮ Although a presumption of resulting trust ordinarily arises where property is purchased with funds of one person and title taken in the name of another, nevertheless, where it is shown that the party paying the purchase price did so with the express object of providing a home for the person in whose name title is taken, the presumption of resulting trust does not prevail, but the fact that title is taken in the name of the person for whom the home is provided, is some evidence that a gift of the fee was intended.

The situation of the parties and the statements and declarations of plaintiff contained in the letters he wrote to Iris Ashton at the time of and after the purchase of the property strongly confirm the finding of the trial court that a gift of the fee title was intended, if, indeed, they are not absolutely inconsistent with any other interpretation. The Ashtons made their home in this property from the time of its purchase, and were still residing in it when the present action was filed. Plaintiff made absolutely no claim to it until some time in 1928, after his second marriage, which occurred in 1924. Iris Ashton married one Arthur Evans in November, 1927. Plaintiff was a middle-aged man when the property was purchased in 1922. He had lost his wife and child, and had no close relatives except a brother, a retired English army officer of high rank, who was financially independent. Plaintiff had lived for many years in a mining district in a foreign country. He seems to have been a man of con-

siderable means. His services at the mine were performed under a twenty-year contract, which yielded him $12,500 annually. The Ashtons were dear friends of years standing, and were in straitened circumstances. In addition, his letters revealed that he had developed a romantic attachment for the daughter.

Appellant had made the happiness of the Ashton family, and of Iris Ashton in particular, his chief concern. In a letter written on the train after he had left Iris at San Antonio, he said: ''You owe me nothing, you have given me far more than I have given you, so much more that I feel a great debt of gratitude. I feel that you and your mother put too much value on the little things I have done for you and I would have you minimize them and think only of me as a great old friend who wants to bring happiness and joy into the home of a brave family where all have suffered in so many ways.''

On June 25, 1922, he wrote to Iris Ashton: ''It is so like you to want to thank me for these odds and ends, you attribute all your happiness and much more to me and what I have done. You are a dear Ma Mie and I know you feel every word you write, but a great big 'but' it is selfishness on my part really, because I want to feel sometime a little ray of happiness and how can I do this, how can I get this except by reflection from those who are happy. To know that a load has been lifted from your young life— to know you see life differently now, to know that you have courage, hope and have found your own ideals again, to know your mother will again smile and sing—are these not the only ones that matter—they all make me want to live, to recover my almost dead self, to feel, to dream, to live again—selfishness at the bottom of it all, and I am still heavily in your debt.''

These quoted statements are not isolated remarks, but strike the keynote of the entire correspondence. Appellant also expressed the wish in a letter written to Mrs. Ashton, as well as in one of his letters to Iris Ashton, that he might help the son Dolph Ashton to become established in some sort of a business.

In none of the letters written by plaintiff is there the slightest suggestion that plaintiff intended to retain any interest in or control over the property. Iris Ashton was to

have a home "which *no one* could take from her." The *"only condition"* attached by plaintiff was that the house must never be encumbered. He wrote: "Standing as it does in your name alone, no one can pledge it without your consent, and that I know will never be given." Prior to the purchase he had suggested that the title be in her mother's name or his name *as her guardian* until the conclusion of the divorce proceedings. That he should hold *as her guardian* is some evidence that the entire beneficial interest was to be vested in her. In it our conclusion that the trial court's finding that a gift was intended finds support in the evidence.

We are not unmindful of certain statements made by Iris Ashton in her letters to plaintiff upon which he relies in the case herein as indicating that she understood that he had bought the property as an investment, with the idea that the Ashtons should make their home therein so long as it should be mutually agreeable. It is significant that these statements from which it might be inferred that a gift of the fee was not intended, emanate from Iris Ashton rather than from plaintiff, the donor. Standing alone, said statements lend support to appellant's contention. But before the conclusion of the trial court can be disturbed it must appear as a matter of law that a gift of the fee was not intended. When the record as a whole is considered, the statements relied on fall far short of grounds for reversal.

We have also read the letter written by Frank Ashton to his daughter, in which he expressed his view that the house was not a gift to Iris Ashton. The premise of his argument is that if a gift to Iris Ashton had been intended title would not have been taken in the name of Cora Ashton. He writes: "It is certain that Mr. Browning had no matrimonial intentions, therefore the principal object of his generosity viz. to relieve Cora and at the same time show me a mark of thoughtful consideration would certainly not have been achieved by making the house a *gift to you*." And again: "At the time I thought it very strange that the place should be a *gift to you* when it was placed in Cora's name.

"If his kindness and behavior towards you were flattering it is no evidence that he intended the house as a gift to you. If he had so intended it would have been at once so deeded."

The father was in Mexico when the house was purchased, and did not participate in the transaction. The statements in Frank Ashton's letter reveal a lack of knowledge of plaintiff's intention, as expressed in his letters, that the property should be taken in the name of Cora Ashton only because of the contemplated divorce proceedings, and should be transferred to Iris Ashton upon the conclusion of such proceedings.

The letters written by plaintiff, as previously quoted, tended strongly to refute the contentions that the conveyance to Iris was wrongful and made without his knowledge and consent, and that he did not learn of it until 1928. This circumstance of itself may have influenced the trial court to reject other portions of his testimony to the effect that he did not intend to make a gift of the property, and to accept the testimony of Iris Ashton, which finds corroboration in the letters written by plaintiff. The evidence supports the judgment.

Judgment affirmed.

Preston, J., Shenk, J., Langdon, J., Curtis, J., Waste, C. J., and Thompson, J., concurred.